UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MIGNON HILL,<br><br>    Plaintiff,<br><br>v.<br><br>WESTERN WAYNE FAMILY HEALTH CENTERS, a domestic for-profit corporation, and MARVA HAIRSTON in her official and unofficial capacity, jointly and severally,<br><br>    Defendants. | Case No. 14-12154<br>Honorable Laurie J. Michelson<br>Magistrate Judge David R. Grand |

**OPINION AND ORDER GRANTING MOTION TO STRIKE [20], GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [16], AND DENYING AS MOOT DEFENDANTS' MOTION IN LIMINE [22]**

Plaintiff Mignon Hill alleges that she was illegally terminated from her employment with Defendant Western Wayne Family Health Centers ("WWFHC") due to her pregnancy. She asserts a claim under the Family and Medical Leave Act ("FMLA") and a claim for "discrimination." But several undisputed facts preclude her claims. After Hill became pregnant, she received a raise as well as a positive year-end performance review. At the time of her termination, Hill had been out on maternity leave for approximately eighteen weeks despite only being eligible for twelve. No employee in the history of WWFHC had ever been granted so much leave. And Hill admitted in her deposition that she was not subjected to any schedule changes or other adverse actions before going out on leave. Her attempts to create a *genuine* issue regarding these material facts fall short. And based on these facts, the Court finds that Defendants are entitled to judgment as a matter of law on both of Hill's claims. Therefore, Defendants' motion for summary judgment will be granted.

**I. DEFENDANTS' MOTION TO STRIKE**

Before the Court addresses the substance of Defendants' summary-judgment motion, it must decide whether to consider the affidavit of Sherri Miller. (Dkt 19.) Plaintiff filed this affidavit on May 6, 2015—a week after Defendants filed their reply brief. (*Id.*) Defendants argue that despite the fact that Miller was included in Plaintiff's Rule 26(a) disclosures, Plaintiff never disclosed her intention to use this witness and never disclosed the "knowledge this witness supposedly possessed[.]" (Dkt. 20 at 2.) Plaintiff responds that her "counsel was only able to obtain the affidavit of Sherri Miller after her signature was notarized in May of 2015, otherwise such would have been produced prior." (Dkt. 21 at 2.) The Court is not impressed by this explanation—surely Plaintiff's counsel had access to a notary during discovery as all the other affidavits are notarized, and Plaintiff does not say that Miller was unavailable to sign the affidavit for the entirety of discovery in this case. Plaintiff also argues that "Defendants have had several months to take the deposition of Sherri Miller yet did not do so." (*Id.*) But the same logic applies to Plaintiff's failure to secure Miller's affidavit before the summary-judgment cutoff.

Both parties argue that there is no authority as to the proper recourse in this situation—this is, where a Plaintiff seeks to introduce a new affidavit from a witness, who was disclosed from the beginning, after summary-judgment briefing is complete. The Court has found some. *See, e.g.*, *Miami Valley Contractors, Inc. v. Town of Sunman, Ind.*, 960 F. Supp. 1366, 1371 (S.D. Ind. 1997) (collecting cases); *Lawrence v. Norton*, No. CV-04-0203-EFS, 2006 WL 850878, at *1 (E.D. Wash. Mar. 28, 2006) *aff'd sub nom. Lawrence v. Dep't of Interior*, 525 F.3d 916 (9th Cir. 2008). The *Miami Valley* case is similar to this situation: the Defendant there submitted supplemental exhibits after the summary-judgment motion was fully briefed. 960 F. Supp. at 1371. The court granted a motion to strike the exhibits because the defendant did not

seek leave to file them, offered "no justification" for its failure to produce them earlier, and "[p]lainly" understood that it needed to provide the type of evidence it sought to add to the record before summary-judgment briefing closed. *Id.* The same is true here—Plaintiff did not seek leave to file the supplemental affidavit, has not offered a convincing justification for her failure to produce the affidavit earlier, and the fact that Miller's affidavit is very similar to the other ones Plaintiff relies on (*e.g.* Def.s' Ex. BB, Bellazer Aff.) indicates that Plaintiff had plenty of notice that this affidavit would be useful in responding to Defendants' motion for summary judgment. For these reasons, the Court will grant Defendants' motion to strike. (Dkt. 20.) The Miller affidavit will not be considered.[1]

## II. FACTUAL BACKGROUND

WWFHC is a federally qualified health center serving uninsured and underinsured patients. (Def.s' Ex. B., Atkins Dep. at 82.) Mignon Hill worked there from February 7, 2011 through February 3, 2012, when she left for maternity leave. (Def.s' Ex. C, Hill Dep., at 66–67.) During Hill's employment, Marva Hairston was WWFHC's Human Resources Director. (Atkins Dep. at 81.) According to payroll records, WWFHC had 45 employees as of January 27, 2012. (Def.s' Ex. G, Payroll Records at Jan. 27, 2012.) The Employee Handbook noted, "WWFHC is NOT covered under the FMLA due to its size." (Def.s' Ex. E, Employee Handbook at 22.)

Hill became pregnant around fall 2011. She testified that after becoming pregnant (and giving Hairston notice of that fact), she received a raise as well as a positive year-end performance review. (Hill Dep. at 80–85.) Nonetheless, she says that she was "treated

---

[1] Even if the Court were to consider the affidavit, its substance is largely the same as the affidavit that Brittany Bellazer swore out. And, as discussed below, all of the assertions from Bellazer's affidavit—i.e. that Hill was not allowed to use the bathroom or take breaks—were squarely contradicted by Hill's own admissions in her deposition testimony. So the Court would not reach a different result even considering Miller's affidavit.

3

differently" at work following her pregnancy. (Pl.'s Resp. Br. at 1.) First, she says that she was not allowed to take breaks or use the bathroom. (*Id.*) She cites the affidavit of Brittany Bellazer in support of this assertion; Bellazer claims to have witnessed denials of bathroom breaks in her affidavit. (Def.s' Ex. BB, Bellazer Aff. at ¶ 3.) However, Bellazer actually retreated from her affidavit during her deposition: she only recalled one time that Hill was not allowed to go to the bathroom, and that was because it was WWFHC's policy for a front desk person to wait for someone else to cover the desk before leaving for a bathroom break. (Def.s' Reply Ex. 6, Bellazer Dep. Excerpt.) And in her deposition, Hill admitted she was "allowed to sit as needed" and "allowed to use the bathroom as needed" and "no schedule changes were made" after she became pregnant. (Hill Dep. at 133.)

Hill also says that she was harassed. For example, before Hill's pregnancy leave, on November 18, 2011, she presented Hairston with documentation from her doctor and Hairston became upset and started "raging, like roaring, yelling, telling me I had to go and I couldn't work." (Hill Dep. at 140.) Apparently Hairston also threatened to call the police for some reason. (*Id.*) But Hill also testified that she was paid for that day of work and that the conversation did not result in any personnel action being taken against her. (*Id.*) Bellazer and Gail McGlory witnessed her crying on other occasions, and attributed it to general mistreatment by Hairston. (Bellazer Aff. at ¶ 3; Pl.'s Ex. 2, McGlory Dep. at 12.)

Finally, Plaintiff points to Linda Atkins' testimony (the CEO of WWFHC) that she had stated, in regards to Kia Morgan, another pregnant WWFHC employee, that she would have had concerns about hiring a pregnant employee because the organization would inevitably have to fill the position during that employee's maternity leave. (Pl.'s Ex. 9, Atkins Dep. at 19.) The record reflects that Morgan also went out on maternity leave for eight weeks, returned to work without

any problems, and eventually left WWFHC on good terms when she moved out of state. (Hairston Dep. at 41–42.)

In any event, Hill was approved for maternity leave beginning on February 3, 2012. During her leave, she was not paid, but retained her fringe benefits. (Employee Handbook at 22.) While her leave was authorized for only eight weeks (with the possibility of a four-week extension), she remained out of work longer, without contacting WWFHC directly. (Def.s' Ex. F, Termination Letter.) Then, approximately eighteen weeks after starting her leave, on June 8, 2012, she was notified that her employment had been terminated. (*Id.*) The letter read as follows:

> In accordance with our employee handbook, which our records show you received a copy of on February 7, 2011, you were eligible to receive a leave of absence for eight (8) weeks with a possible extension of four (4) additional weeks. . . . As of this date, we have not heard from you and must assume you have abandoned your position. You have also been off work for more than twelve (12) weeks, the maximum period of leave allowable.

(*Id.*) Hill admitted in her deposition that she understood the reasons for the termination to be those set out in the June 8 letter. (Hill Dep. at 202.) Additionally, no employee in the history of WWFHC had ever been given over 12 weeks of leave—until Hill. (Def.s' Ex. J., Resp. to Interrog.)

Hill filed suit in this Court on May 30, 2014. (Dkt. 1, Compl.) She alleged one count of "Discrimination." (Compl. at ¶ 23.) She also alleged a violation of the Family and Medical Leave Act ("FMLA"). (Compl. at ¶¶ 36–57.)

Defendants filed their motion for summary judgment on March 30, 2015. (Dkt. 16.) The motion is fully briefed. After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motion. *See* E.D. Mich. LR 7.1(f)(2).

**III. ANALYSIS**

The Court finds that Hill cannot survive summary judgment on any of her claims. The undisputed facts reflect that Defendants fired her because she did not return to work well after exhausting the maximum amount of leave allowable under WWFHC's policies as well as under FMLA. So the Court will grant Defendants' motion.

### A. Count I: Discrimination

Plaintiff's Complaint cited both Title VII and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), and in her response brief, she states that her "sex discrimination claim [is] based on her being treated differently due to her pregnancy." (Pl.'s Resp. Br. at 11.) She asserts that she "plead both a disparate treatment claim and a mixed motive claim," and argues both theories in her brief. (*Id.*) Because "[c]ases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases," the Court analyzes the two claims together. *Rodriguez v. FedEx Freight East, Inc. (In re Rodriguez)*, 487 F.3d 1001, 1007 (6th Cir. 2007); *but see Acker v. Workhorse Sales Corp.*, No. 06-CV-14467, 2008 WL 4104499, at *4 (E.D. Mich. Sept. 2, 2008) *aff'd*, 327 F. App'x 628 (6th Cir. 2009) (noting that "the Sixth Circuit chose not to extend its "mixed-motive" holding [in *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)] as a part of Michigan law.")

"Title VII's prohibition on employment practices that discriminate 'because of [an] individual's sex,' applies with all its force to employers who discriminate on the basis of pregnancy." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 657 (6th Cir. 2000); *Ensley-Gaines v. Runyon*, 100 F.3d 1220 (6th Cir. 1996) ("[T]he [Pregnancy Discrimination Act] transforms improper distinctions based on pregnancy or potential pregnancy into overt sex discrimination violative of Title VII.").

6

In a mixed-motive claim, "a Title VII plaintiff . . . need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) "race, color, religion, sex, or national origin was a motivating factor" for the defendant's adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008).

It is undisputed that Hill was terminated—and it is "obvious" that "firing an employee constitutes an adverse employment action." *Spees v. James Marine, Inc.*, 617 F.3d 380, 394 (6th Cir. 2010). And just as clear, Hill took leave because she was pregnant. However, "the *White* analysis does not hinge on whether [Hill's] pregnancy was a link in the chain of events that resulted in her firing. Rather, *White* directs [the Court] to examine whether there is evidence that [Defendants were] *motivated* by [Hill's] pregnancy in making [their] decision to terminate her." *Id.*

On this record, there is no such evidence. Defendants say that Hill was terminated because she had exhausted all of her leave and had failed to return to work—indeed, these are the reasons set forth in Hill's termination letter. According to the Employee Handbook, Hill was eligible for eight weeks of maternity leave with the possibility to extend for four additional weeks. (Employee Handbook at 22.) Hill remained on maternity leave for nearly eighteen weeks—the most ever allowed for an employee of WWFHC. (Def.s' Ex. J., Resp. to Interrog.) There is no evidence that Hill would have been eligible or had ever applied for additional leave under the Personal Leave policy. (Employee Handbook at 22–23.) And Defendants did not tell Hill not to come back to work; from the record, it appears that there was no direct communication between Hill and Defendants after she went out on leave until the Termination Letter. Nor is there any evidence that other, non-pregnant employees were able to return to work

7

despite exhausting all available personal leave. In fact, the Employee Handbook specifically states that "there is no guarantee of a position being available upon return from the Personal Leave of Absence." (*Id.* at 23.)

Moreover, Hill has not identified any other adverse actions taken against her by Hairston or WWFHC. By Hill's own admission, she was "allowed to sit as needed" and "allowed to use the bathroom as needed" and "no schedule changes were made" after she became pregnant. (Hill Dep. at 133.) Though Bellazer said in her affidavit that Hill was not allowed to use the bathroom, she clarified in her deposition that there was in fact only one such instance and Hill was merely asked to wait for someone to cover the front desk before using the bathroom. (Bellazer Dep. Excerpt.) Indeed, Hill's team leader, Chris Hamilton, said: "I know first hand that Ms. Hill . . . got up to go to the bathroom and/or to drink water . . . . There was never any different treatment of Ms. Hill in that regard as compared to any other employee." (Def.s' Ex. T, Hamilton Aff.)

Hill also bases her mixed-motive claim on a November 18, 2011 conversation regarding a doctor's note that she presented to Hairston after she had been off work for a few days due to her pregnancy. Hairston allegedly treated Hill "with disdain" and started "raging" and Hill began to cry. (Hill Dep. at 138–41.) Bellazer and Gail McGlory also witnessed her crying. (Bellazer Aff. at ¶ 3; Pl.'s Ex. 2, McGlory Dep. at 12.) But it is unclear what exactly was said during the conversation, or whether any consequences resulted from the conversation—Hill testified that there were no changes in her pay or schedule, nor was she disciplined as a result of the incident. (Hill Dep. at 148.) Hairston testified—and Hill acknowledged—that she told Hill that she needed clarification on what the note meant so that she could know "exactly what we needed to do to *help* [Hill.]" (Hairston Dep. at 73 (emphasis added); Hill Dep. at 141.) Moreover, Hill returned to work on that day with full pay. (Hairston Dep. at 85.) And to the extent that Hairston did "yell[]"

8

at Mignon (Hill Dep. at 140), mere yelling on one occasion is not "a materially adverse change in the terms and conditions of employment because of the employer's actions." *Steward v. New Chrysler*, 415 F. App'x 632, 640 (6th Cir. 2011) (citation omitted). Further, multiple employees testified that Hairston was rude to everyone, pregnant or not. (Bellazer Dep. at 62–63; McGlory Dep. at 28.)

In the alternative, Plaintiff turns to the *McDonnell-Douglas* burden-shifting framework as it applies to disparate treatment claims. (Pl.'s Resp. Br. at 14.) Under a disparate treatment theory,

> the plaintiff first establish a prima facie case of unlawful discrimination by showing that 1) she was pregnant, 2) she was qualified for her job, 3) she was subjected to an adverse employment decision, and 4) there is a nexus between her pregnancy and the adverse employment decision. In a termination case such as this one, a plaintiff meets the second prong by showing that she was performing "at a level which met [her] employer's legitimate expectations."

*Cline*, 206 F.3d at 658 (citations omitted). If the plaintiff makes this showing, "the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant satisfies this burden, the *McDonnell-Douglas* presumption of intentional discrimination 'drops out of the picture'" and the plaintiff must show that "the legitimate reasons offered by the employer were not its true reasons, but were a pretext for intentional discrimination." *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996) (citations omitted).

First, it is undisputed that Hill was pregnant (at least immediately prior to and during her maternity leave.) Second, while Defendants do not specifically comment on the adequacy of Hill's performance, she did receive a positive performance review, and her former supervisor Kim Smith said in her affidavit that Hill was "very good at her job[.]" (Def.s' Ex. Z, Smith Aff. at ¶ 3.) Third, again, termination is clearly an adverse employment action (the other allegedly

adverse actions do not serve to meet Hill's burden on this element for the reasons set forth above). Finally, there is at least some nexus between the termination and the pregnancy, for Hill took maternity leave because she was pregnant and she was terminated while still out on leave.[2] *See Megivern v. Glacier Hills Inc.*, 519 F. App'x 385, 396 (6th Cir. 2013).

Defendants have articulated the following nondiscriminatory reason for the termination: Hill had exhausted her maternity leave without returning to work. Hill can demonstrate that Defendants' proffered reason was a pretext by showing that "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir.2000). "At all times, '[Hill] retains the burden of persuasion.'" *Megivern*, 519 F. App'x at 396 (citing *Burdine*, 450 U.S. at 256). Hill has made no such showing here.

Again, when Defendants terminated Hill, they wrote: "You have . . . been off work for more than twelve (12) weeks, the maximum period of leave allowable." (Termination Letter.) It is undisputed that Hill was off work for nearly eighteen weeks. Further, the Employee Handbook makes clear that after a personal leave of absence, "there is no guarantee of a position being available[.]" (Employee Handbook at 23.) Both Defendants and Hill say that there were no non-pregnant employees who were able to return to work after taking eighteen weeks off. (Def.s' Answers to Interrog.; Hill Dep. at 98–99.)

While Hill argues that Defendants should have known that she needed more leave time due to the issues with her pregnancy, she relies on her communications with her benefits provider, Lincoln Financial, not any communications with Defendants themselves. (Pl.'s Resp. Br. at 14.) Hill testified that she did not know whether Lincoln Financial passed along her

---

[2] This does not undermine the Court's determination in the mixed-motive analysis that Hill did not present evidence that the pregnancy *motivated* the termination.

10

communications to WWFHC, nor does she point to any deposition testimony from Hairston, Atkins, or anyone else at WWFHC stating they had received updates from Lincoln Financial while Hill was out on leave. And even if she had applied for additional maternity leave, she had already exceeded the maximum amount of leave by the time she was terminated.

Finally, the Court is not persuaded by Hill's argument that Defendants have a "pattern and practice of discriminating against pregnant employees." (Pl.'s Resp. Br. at 15.) The Sixth Circuit has considered such "pattern" or "me too" evidence in the context of the pretext step of the *McDonnell Douglas* framework. *See, e.g.*, *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998); *Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 F. App'x 620, 625 (6th Cir. 2010); *but see Schrack v. RNL Carriers, Inc.*, 565 F. App'x 441, 445 (6th Cir. 2014) (discussing the admissibility of such evidence at trial).

Specifically, Plaintiff relies on the following passage from Atkins' deposition, regarding former WWFHC employee Kia Morgan:

> Q: In regards to [Kia] Morgan did you ever make a statement something to the effect of if you knew [Kia] Morgan was pregnant that you never would have hired her?
>
> A: Actually I was talking to one employee about that and it was just something I said at the time. I didn't really mean anything by it, but we were—I was concerned that, you know, when she goes out on pregnancy we'd have to fill her position.

(Atkins Dep. at 19.) But the record is clear that Morgan in fact continued to work for WWFHC, took almost 8 weeks of maternity leave, returned to work, and then voluntarily resigned her employment in order to move out of state. (Def.s' Ex. 9, Lewis Aff. at ¶ 2; Hairston Dep. at 41–42.) And nothing suggests that Atkins continued to harbor these concerns about pregnancy at the time Hill was terminated.

For these reasons, the Court finds that Plaintiff has not carried her burden on either the mixed motive or disparate treatment theory.

### B. Count II: FMLA Violation

The FMLA only covers employers of a certain size. According to the statute, a covered employer "means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year[.]" 29 U.S.C. § 2611(4)(A)(i); *see also Humenny v. Genex Corp.*, 390 F.3d 901, 904 (6th Cir. 2004) ("The FMLA excludes from coverage 'any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50.'" (citing 29 U.S.C. § 2611(2)(B)(ii)).)

Defendants insist, without citing any other authority, that this means that "the FMLA applies **ONLY** to employers that, *AS OF THE TIME THE LEAVE IS REQUESTED*," meet that requirement. (Def.'s Reply at 1 (bolding, italics, underlining, and sizing in original).) Not so. The text of the statute requires only that the employer employ 50 or more employees for 20 or more workweeks "in the current or preceding calendar year"—the time the plaintiff takes leave is relevant only to determining which years the Court is to examine. Indeed, FMLA regulations provide, "A private employer is covered if it maintained 50 or more employees on the payroll during 20 or more calendar workweeks (not necessarily consecutive workweeks) in either the current or the preceding calendar year." 29 C.F.R. § 825.105; *see also Walters v. Metro. Educ. Enterprises, Inc.*, 519 U.S. 202, 207 (1997) ("[T]he Family and Medical Leave Act of 1993 . . . defines 'employer' as a person who 'employs 50 or more employees for

12

each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.'").

Defendants have not presented the information the Court needs in order to evaluate whether WWFHC is a covered employer under the correct standard. Defendants have provided biweekly payroll records from January 2011 through June 2012. (Def.'s Ex. G.) Of these, there are four payroll lists where there were over fifty employees:[3] April 20, 2012, June 1, 2012; June 15, 2012; and June 29, 2012. (*Id.*) While that is only eight weeks, the Court does not have the payroll records for July 2012 onward—leaving approximately 24 weeks unaccounted-for. And further, Plaintiff cites Hairston's deposition testimony that WWFHC employed an intern, Anthony Cane, for "[a] year and a half," and one other intern whose name Hairston could not remember at some point during 2012. (Pl.'s Resp. Br. at 17.) Assuming two extra employees for the entirety of 2012, it would tip the balance over fifty on two payrolls—March 23, 2012 and April 6, 2012. That would give four additional weeks with over 50 employees. Given that the 20 consecutive weeks need not be consecutive, the Court cannot say that WWFHC is not a FMLA-covered employer as a matter of law.

Defendants next argue that Hill was not an "eligible employee" under FMLA. The statute provides that an "eligible employee" is one who has been employed "for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title" and "for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C.A. § 2611. "The determination of whether an employee meets the hours of service requirement and has been employed by the employer for a total of at least 12 months must be

---

[3] Under FMLA regulations, "Any employee whose name appears on the employer's payroll will be considered employed each working day of the calendar week, and must be counted whether or not any compensation is received for the week." 29 C.F.R. § 825.105(b).

13

made as of the date the FMLA leave is to start." 29 C.F.R. § 825.1109(d). Plaintiff testified, and the written documentation supports, that she worked from Monday, February 7, 2011 through February 3, 2012. (Hill Dep. at 66–67; Termination Letter; Pl.'s Ex. 1, Offer Letter.) While close, this is not a full year.

And even if it were, *see* 29 C.F.R. § 825.110(b) ("52 weeks is deemed to be equal to 12 months."), the Court would grant Defendants' motion for summary judgment because Hill's FMLA claim fails on the merits. For eligible employees working for covered employers, FMLA protects twelve weeks of leave within a 12-month period. 29 U.S.C. § 2614(a)(3)(B). "Once the 12–week period ends, however, employees who remain 'unable to perform an essential function of the position because of a physical or mental condition ... [have] no right to restoration to another position under the FMLA." *Mendel v. City of Gibraltar*, 607 F. App'x 461, 465 (6th Cir. 2015) (citations omitted); *see also Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 785 (6th Cir. 1998).

It is undisputed that Hill took approximately 18 weeks of leave. Accordingly, her termination cannot give rise to an FMLA claim. *Coker v. McFaul*, 247 F. App'x 609, 620 (6th Cir. 2007) ("Once an employee exceeds his twelve work weeks (or sixty workdays) of FMLA leave, additional leave in the twelve month period is not protected by the FMLA, and termination of the employee will not violate the FMLA."). Hill also admits that she was allowed bathroom breaks and that her schedule did not change, and she does not identify any other way in which Defendants interfered with her ability to take leave under FMLA—indeed, it would appear that she was given all of the leave that FMLA would have covered.

Therefore, Defendants are entitled to summary judgment on the FMLA claim.

**IV. CONCLUSION**

Hill has not met her burden on either of her two counts. Accordingly, IT IS ORDERED that Defendants' Motion for Summary Judgment (Dkt. 16) is GRANTED. IT IS FURTHER ORDERED that Defendants' Motion in Limine (Dkt. 22) is DENIED AS MOOT.

This case is DISMISSED. A separate judgment will follow.

SO ORDERED.

                          s/Laurie J. Michelson
                          LAURIE J. MICHELSON
                          UNITED STATES DISTRICT JUDGE

Dated: February 22, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 22, 2016.

                          s/Jane Johnson
                          Case Manager to
                          Honorable Laurie J. Michelson